**James PILLAR, Plaintiff–Appellant,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 15, Defendant–Appellee.**

No. 03–3834.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 2004.

Decided April 7, 2004.

Dorothy A. O'Brien, Marlita A. Greve, O'Brien & Greve, Davenport, IA, for Plaintiff–Appellant.

Sally E. Barker, Christopher N. Grant, Schuchat, Cook & Werner, St. Louis, MO, for Defendant–Appellee.

Before FLAUM, Chief Judge, COFFEY, and EVANS, Circuit Judges.

## ORDER

James Pillar worked for Commonwealth Edison (ComEd) at its Quad Cities Nuclear Generating Plant for more than 18 years when he was terminated after a 5–month absence from work. Pillar was terminated, says the company, because he failed to return a completed Family and Medical Leave Act certification form as requested by the company. The company claimed that the form, which could have arguably justified his absence, was its last attempt to keep Pillar as an employee after his unprecedented sojourn from his job.

Pillar, who is African–American, sued ComEd over his termination, but the case was settled. In this case, Pillar has sued his union, claiming it failed, for racial reasons, to fulfill its duty of fair representation by not vigorously pushing a grievance with ComEd over his termination. His suit against the union is somewhat odd because, in settling with the company, Pillar waived reinstatement. It is therefore uncertain what Pillar could expect to gain from this case if he is successful—as reinstatement is the normal remedy for a successful grievance over a termination—but that is a question we need not pass on because his case against the union was dismissed, correctly as we shall see, by the district court judge on summary judgment.

Pillar's union, the International Brotherhood of Electrical Workers, Local 15, had a duty to fairly represent him and push a grievance against ComEd if his termination was arguably without just cause as required by the collective bargaining agreement. If the union failed to assert Pillar's rights under the CBA because of his race, that would be a clear violation of 42 U.S.C. § 1981. *See EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 656 (7th Cir.2003) (explaining that if a black worker asks the union to grieve a

complaint, the union refuses, and the union would grieve the complaint if the worker were white, this would be a "clear violation" of Title VII as well as the union's duty of fair representation). But a union does not violate its duty of fair representation when it reasonably concludes that an employer had just cause for terminating an employee and the pursuit of a grievance, therefore, would be futile. *See Konen v. Int'l Bhd. of Teamsters*, 255 F.3d 402, 407 (7th Cir.2001) (noting that "so long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary," and therefore actionable) (internal citation omitted). A review of the facts leads to the inescapable conclusion that this is the case here.

Upon learning that Pillar was discharged, Local 15 stewards met with Pillar. They gathered facts relating to his termination and filed a grievance. They then took the grievance to Dean Apple, a union business representative, for his review. Apple concluded that it lacked merit, and he withdrew it. There is nothing in this record to remotely suggest that (1) race played a role in that decision or (2) that anything other than a lack of possible success—because ComEd had just cause for its action—motivated the action. What follows are the undisputed facts that lead to Pillar's discharge.

ComEd requires that any employee, absent for more than 3 days due to "disability," (which in this context means an illness that excuses an absence from work) must submit written certification of his condition. The company processes disability claims through its Mutual Benefit Association (MBA). As explained in the MBA disability plan, "[i]f the disability continues for more than three days, the Participant must furnish his Employer with a completed Proof of Disability form executed by his doctor as required by [the Company]."

The required proof of disability form serves as the employee's application for disability leave and benefits and also for leave under the Family Medical Leave Act (FMLA). The form notifies the employee that the absence "has been preliminarily counted toward your Family/Medical Leave Act entitlement, and under the Company's FMLA Policy, FMLA leave runs concurrently with disability leave." For both receipt of MBA disability benefits and FMLA leave, Company approval is required. The MBA plan states that the proof of disability form "must be completed by the Participant to the satisfaction" of ComEd. FMLA leave for "personal illness" must meet the criterion of a "serious health condition," and employees must complete a leave request form to be approved by local management.

ComEd's Occupational Health Services Department handles claims for leave. The company's doctors look at the diagnosis of the employee's doctor, as well as other relevant information, and decide whether the diagnosis is reasonable and whether or not the employee should stay off work. The company reserves the option of disagreeing with the employee's doctor concerning ability to return to work.

If an employee is denied paid disability, he may file an appeal with the MBA. Under the CBA, the union cannot grieve a denial of disability benefits.

On October 20, 1999, Pillar was called into a meeting by Doug Thompson, his department head, to discuss his prior use (according to the company, misuse) of comp time. Randy Kuehl, a union steward, was with Pillar at the meeting. Thompson informed Pillar that he needed to obtain prior approval before taking any

more comp time and that he could not just take it on his own. Pillar got angry, believing that Thompson was harassing him. He swore at Thompson, telling him that he was "tired of his [Thompson's] bullshit." Pillar then said that he felt ill and he left the meeting. From that day until his discharge 5 months later on March 24, 2000, Pillar never worked another day at ComEd. During the 5-month period he never submitted an MBA proof of disability form nor an FMLA certification form.

On October 22, 1999, 2 days after the meeting with Thompson, Pillar gave the company a note from Dr. Ahmad Chamany stating that Pillar was suffering from anxiety and should be further evaluated. Four days later, on October 26, Pillar met with ComEd's psychiatrist, Dr. Edward Tuder, who had evaluated Pillar in 1988 and 1989. Dr. Tuder determined that Pillar was medically able to return to work on October 27. The doctor signed a form to that effect and informed the company by phone that Pillar could return to work.

Pillar, of course, did not return to work on October 27. He did not even call the company to let them know that he was not going to show up. On November 2, Steve Simpson, the human resources manager at ComEd, sent Pillar a letter telling him to contact the company immediately or risk termination. Subsequently, Pillar called and spoke with Lynne Sondgeroth, a human resources representative. After some discussion regarding his absence, Sondgeroth instructed Pillar to report to work on November 12 to meet with Simpson.

The meeting on November 12 was relatively short. Simpson asked Pillar where he had been. Pillar stated that he had sent in a doctor's note (meaning Dr. Chamany's 10/22/99 note) stating that he was unable to work. Simpson explained to Pillar that it was the company's doctor who determines whether or not an employee is eligible to work, not an employee's personal doctor. Simpson agreed, however, to contact the medical department again and see if Dr. Tuder's assessment had changed.

One week later, on November 19, Simpson was advised that Dr. Tuder stood by his original decision that Pillar was able to return to work. Another letter went out telling Pillar to report to work on November 29. Meanwhile, Pillar filed a charge of race discrimination and retaliation against ComEd with the Illinois Department of Human Rights.

On November 29, Simpson and Pillar spoke outside the company's training center. Pillar requested that he be allowed to take two vacation days and a comp day before returning to work. Simpson agreed and instructed him to return to work on December 6.

December 6 came, but Pillar didn't. Instead, he furnished a note from a new psychiatrist, Dr. G. Narayan, stating that he (Pillar) was advised to rest and stay away from work for an unknown period of time.

On December 30, Simpson wrote another letter to Pillar stating that Dr. Narayan had informed the company's medical department that Pillar had not authorized him to disclose any information about his condition. Subsequently, Pillar signed a limited authorization. The company then arranged for Pillar to be examined by Dr. Tuder again. At the last moment, however, Pillar cancelled that appointment.

Dr. Narayan discussed Pillar's condition with Dr. Tuder twice. On January 21, 2000, Dr. Narayan told Dr. Tuder that Pillar was having problems with his anger. Then, on March 17, Dr. Narayan informed Dr. Tuder that Pillar was working with Dr. Joseph Cress. He also told him that Pillar had stopped taking medication. At this

time, Pillar admitted to having "controlled anger," but Dr. Narayan noted that Pillar had good thought process and fair social judgment and insight.

Around this same time, on February 1, Dr. Cress, Pillar's treating psychologist, sent a letter to Dr. Tuder. Dr. Cress diagnosed Pillar with "Depressive Disorder, NOS." While he noted that Pillar had a few recent "slips in anger management," he concluded that Pillar was "functioning adequately." The letter did not state that Pillar could not return to work.

On March 6, with his status still up in the air, Sondgeroth wrote a letter to Pillar stating that his absences from work could be designated as Family and Medical Leave Act leave if he gave the company a completed certification form which was enclosed. The letter also indicated that his failure to submit the FMLA form would result in his absence from work being counted as unexcused. Sondgeroth consulted with her boss, Simpson, before sending the letter. The company decided to send the letter as a "last resort" to try to determine if Pillar's 5–month–long absence could be excused. While there is a minor dispute as to whether Pillar then spoke to Simpson, it is undisputed that Pillar told an agent at the EEOC at this time that there was "no way" he would take FMLA leave and that he did not fill out and submit the form as requested. Pillar did not submit the form because he believed he should have been given paid disability leave, just like a group of white female employees who had previously sued the company for sexual harassment.

When the company had not received the completed FMLA form from Pillar by March 24, Simpson sent Pillar the letter terminating his employment. Simpson terminated Pillar for not returning the FMLA form. Simpson knew of no other employee who had been absent for as long as Pillar without providing proper medical certification when requested.

While all this was going on, the union was involved in Pillar's plight. A few days after the comp-time meeting with ComEd's Thompson (and union steward Kuehl), Pillar called Dell Jordan, a plant union steward, to discuss what happened at the meeting. Jordan warned Pillar to not do anything stupid like lose his temper and thus give the company a reason to discipline him. Jordan took notes of the conversation and the next day showed them to Simpson in hopes of resolving the problem between them. Jordan next spoke to Pillar around November 2. Jordan had learned that Simpson was sending a letter to Pillar about his absence. Jordan told Pillar that when he received the letter to be sure to call the company immediately or otherwise he might be terminated.

Between November 2, 1999, and March 24, 2000, Pillar and Jordan spoke once. Jordan heard that the company had contacted Pillar about returning to work. But there was nothing the union could do to help Pillar until the company made a decision about what to do with him.

After the company sent Pillar the FMLA form to fill out, on March 6, Pillar called Jordan and asked him about it. Jordan told Pillar that he did not know anything about it and that Pillar had to talk to Simpson. The next time Jordan heard of the matter was on March 24 when Simpson informed him that the company was terminating Pillar.

On April 4, Pillar spoke by phone with Jordan and requested the filing of a grievance over his termination. Jordan suggested that they meet at his house to discuss the matter, and Pillar agreed. At the first meeting, Jordan explained the company's position to Pillar. Jordan and

Pillar then met two more times at Jordan's house, during which time Jordan asked Pillar to give him any written materials supporting the grievance. Pillar subsequently furnished a time-line to Jordan with a set of documents.

On April 19, Jordan and plant steward Dennis Edwards spoke to Pillar by phone. They asked Pillar to give them any additional information supportive of his grievance. Jordan asked for information about Pillar's disability and whether he was ever going to be able to return to work. Pillar subsequently furnished a letter from Dr. Narayan stating that he had spoken to Dr. Tuder on three occasions.

On April 27, the union filed a grievance over Pillar's discharge. In May 2000, Jordan spoke with Apple (as we said sometime ago, the Local 15 business representative) about the grievance. As the union's business representative, it was Apple's responsibility to make the decision whether Pillar's grievance would be pursued. Jordan told Apple about the information Pillar had supplied. Apple determined that Pillar's grievance lacked merit, and he decided to not push it. Apple concluded that Pillar had not submitted sufficient medical information to justify his absence and that he failed to produce "something that really explained his condition and his circumstances."

On top of all this, the undisputed evidence established that within the 2–year period preceding Pillar's problems, the union withdrew the grievances of two white employees working at the plant—Tom Kyarsgaard and Brian Griffen—because their claims lacked merit. In addition, Apple decided to withdraw a grievance over the discharge of a white employee at another plant under his jurisdiction because the employee failed to submit sufficient medical information to support his claim that he could not work the night shift.

During the same period of time, the only discharge grievance the union pursued to the arbitration stage was on behalf of an African–American, Larry Martin. The union demanded arbitration and selected an arbitrator for Martin's grievance, which was then settled on favorable terms.

These facts support the conclusion that the union did not breach its duty of fair representation, and so the judgment dismissing Pillar's suit against it is AFFIRMED.